IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

**NEIL JOCHEM**,

     Plaintiff,

     v.

**MICHAEL J. ASTRUE**, **Commissioner of Social Security,**

     Defendant.

Case No. CV 10-1112-SI

**OPINION AND ORDER**

Merrill Schneider
Schneider Law Offices
P.O. Box 14490
Portland, Oregon 97293
     Attorney for Plaintiff

Amanda Marshall
United States Attorney
Adrian L. Brown
U.S. Attorney's Office
District of Oregon
1000 S.W. Third Avenue, Suite 600
Portland, Oregon 97204

L. Jamala Edwards
Social Security Administration
Office of General Counsel
701 Fifth Avenue, Suite 2900
M/S 221A
Seattle, Washington 98104
     Attorneys for Defendant

**SIMON, District Judge.**

## I.  INTRODUCTION

This is an action to obtain judicial review of a final decision by the Commissioner of the Social Security Administration ("Commissioner") denying the application of Neil Jochem for Social Security Disability Insurance benefits ("DIB") and Supplemental Security Income benefits ("SSI"). Mr. Jochem alleges disability on the basis of chronic back and leg pain and major depressive disorder. The Administrative Law Judge ("ALJ") found that Mr. Jochem's substance abuse was a severe impairment and conducted the analysis required by 42 U.S.C. § 423(d)(2)(c) to determine whether drug or alcohol abuse was a material contributing factor to Mr. Jochem's impairments. On the basis of that analysis, the ALJ found that absent the substance abuse impairment, Mr. Jochem was capable of performing work that exists in the national economy and was therefore not disabled. After the Appeals Council denied review, the ALJ's decision became the final decision of the Commissioner. Mr. Jochem seeks review from this court asserting three objections to the ALJ's conclusions. After reviewing the record, the court affirms the Commissioner for the reasons discussed below.

## II.  BACKGROUND

Mr. Jochem filed an application for benefits on January 4, 2007, alleging disability since December 1, 2004. His claim was denied initially and upon reconsideration. A hearing was held before ALJ Riley J. Atkins on September 21, 2009. On October 6, 2009, the ALJ issued a decision finding Mr. Jochem not disabled.

Mr. Jochem was born in 1955 and was 49 years old at the time of his alleged disability onset date. He has an 11th grade education. His past relevant work is as a mechanic and truck

driver. He has not engaged in substantial gainful activity since his alleged onset date. His date

last insured is March 31, 2010.[1]

## A.    Medical Evidence

### 1.    Depression and Substance Abuse

Mr. Jochem was psychiatrically admitted to a hospital on April 22, 2005, March 1, 2006,

April 27, 2006, and May 14, 2006. Tr. 287, 284, 282, 258, 269. On each occasion before the

May 14, 2006 hospitalization, Mr. Jochem had overdosed on alcohol and medication, explaining

that he had done so because of severe depression after the death of his longtime companion in

September 2004, and chronic pain from arthritic joints and kidney stones. Tr. 284, 285, 258, 259,

254, 269, 270-71. The May 14, 2006 hospitalization occurred after Mr. Jochem lacerated his left

wrist with a razor blade. Tr. 270. He had high blood alcohol levels at the April 22, 2005, March

1, 2006, and May 14, 2006 hospitalizations. Tr. 284, 282, 269. At his April 27, 2006 admission,

Mr. Jochem admitted being a binge drinker. Tr. 287. On each hospitalization, Mr. Jochem was

diagnosed with either Major Depression or Major Depressive Disorder, Anxiety Disorder, and

alcohol abuse. Tr. 285, 283, 255, 346.

Mr. Jochem was given a comprehensive psychodiagnostic examination on March 27,

2007, by John Givi, Ph.D. Tr. 466-72. In addition to a clinical interview, Dr. Givi reviewed

medical records, performed a mental status examination, and administered the Orientation

---

[1] DIB benefits require at least 20 quarters of coverage within the 40-quarter period that ends with the quarter in which the disability occurred. The end of a claimant's insured status is frequently referred to as the "date last insured." In a DIB case, the claimant must prove that the current disability began on or before the date last insured. *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1998). Proving disability before the date last insured is not necessary for receipt of SSI benefits.

subtest of the Wechsler Memory Scale-III ("WMS-III") and the reading subtest of the Wide

Range Achievement Test-3 ("WRAT-3"). Tr. 466.

Mr. Jochem's scores on the WRAT-3 reading subtest fell in the borderline range,

equivalent to a 6th grade reading level. Tr. 469. Basic receptive and expressive language

functions were normal, and there was no evidence of a thought disorder. *Id.* His thinking was

coherent and goal-oriented, and he was able to engage in abstract reasoning. Tr. 471. Memory

testing revealed that Mr. Jochem was able to recall one of the three items he was asked to

remember after a 10-minute delay. He recalled six digits forward and four digits backward, and

completed serial threes from 100 downward with one error. Tr. 470. Dr. Givi observed

Mr. Jochem's affect to be nervous and somewhat tearful. Tr. 470.

Mr. Jochem told Dr. Givi that he was currently taking an antidepressant, a muscle

relaxant, and a pain medication. Tr. 468. He said he had taken Oxycontin for pain in the past, but

stopped voluntarily because he had started to abuse it. *Id.* Mr. Jochem reported anxiety and panic

attacks before his companion died, and depression since her death. *Id.* He said he had attempted

suicide twice and had been hospitalized twice. *Id.* He stated that his last time he felt suicidal was

in July 2006. *Id.* Dr. Givi observed Mr. Jochem's affect to be nervous and somewhat tearful. Dr.

Givi diagnosed Posttraumatic Stress Disorder and Major Depressive Disorder, Recurrent,

Moderate. Tr. 472.

On April 10, 2007, Mr. Jochem was taken by ambulance to the emergency room after

overdosing on alcohol and Xanax. Tr. 654. His blood alcohol level was .229. Tr. 655. He was

referred to outpatient therapy with a psychiatrist. Tr. 656.

An assessment of Mr. Jochem's mental abilities by reviewing psychologist Peter LeBray, Ph.D., dated April 12, 2007, indicated moderate limitations in: (1)  maintaining social functioning; (2) understanding, remembering, and carrying out detailed instructions;  (3) maintaining attention and concentration for extended periods; (4) interacting appropriately with the general public; (5) recognizing normal hazards and taking appropriate precautions; and (6) setting realistic goals or making plans independently of others. Tr. 483, 495-96.

On June 5, 2007, Mr. Jochem was seen in an emergency room for  suicidal ideation. Tr. 534. He was diagnosed with Severe Major Depressive Disorder, Recurrent; Alcohol Abuse; and anxiety. *Id.*

### 2.    Joint Pain

An x-ray of the lumbar spine on October 6, 2004 showed well maintained vertebral body heights and disc spaces. Mild degenerative changes were observed at T10-11 and L3-4. Tr. 383. An x-ray taken on May 14, 2006 also revealed mild degenerative changes. Tr. 277.

Mr. Jochem reported to Dr. Givi that the medication he was required to take for pain precluded driving or working on heavy machinery. Tr. 467. Mr. Jochem rated his arthritis pain as between four and eight on a ten-point scale. Tr. 468.

Mr. Jochem was examined by Michael Henstrom, M.D., on March 26, 2007. Tr. 461-65. Mr. Jochem described pain in his mid low back, radiating to both sides into his hips and the bones of his lower extremities. Tr. 461. Mr. Jochem related that he had a history of clubfeet, surgically repaired. *Id.* Mr. Jochem said he was taking Lortab for pain, on an intermittent basis. Physical examination was negative for radiculopathy. Tr. 464. Dr. Henstrom thought the pain consistent with arthritis as a result of chronic heavy manual labor, although Mr. Jochem had

good range of motion without significant pain in the lower extremities, except in the ankles as a consequence of surgery in the past to correct club feet. *Id.* Dr. Henstrom concluded that Mr. Jochem's back pain was musculoskeletal. *Id.* In Dr. Henstrom's opinion, Mr. Jochem was able to stand and walk for four to six hours out of an eight hour day, and able to sit for an eight hour day. *Id.* Dr. Henstrom limited Mr. Jochem's lifting and carrying to 25 pounds occasionally and 10 pounds frequently, and to only occasional bending, stooping, and crouching. Tr. 465.

An assessment of Mr. Jochem's physical residual functional capacity ("RFC") by reviewing physician Martin Lahr, M.D., dated April 12, 2007, indicated that Mr. Jochem was able to lift 50 pounds occasionally and 25 pounds frequently; stand or walk about six hours in an eight-hour workday; and climb, balance, stoop, kneel, crouch, or crawl without limitation. Tr. 489.

On June 18, 2007, Mr. Jochem saw Jonathan Blatt, M.D. for bilateral lumbar pain. Examination was normal, except for an antalgic gait. *Id.* Range of motion was normal and pain-free except slight pain at the end of extension. Muscle strength was normal. Heel and toe walking was reported to cause low back pain, but appeared normal. Straight leg raising was normal. MRI imaging showed mild degeneration at several levels and a left L5-S1 paracentral herniation with a small free fragment. Tr. 502. Dr. Blatt noted that Mr. Jochem's description of the location of his pain was not consistent with the location of the herniation and fragment shown by the MRI; for this reason,  Dr. Blatt suspected a psychological component to Mr. Jochem's pain. *Id.* On June 22, 2007, Dr. Blatt gave Mr. Jochem bilateral L5-S1 epidural steroid injections. Tr. 499. The injections did not provide relief. Tr. 512.

On September 16, 2009, Mr. Jochem's primary care physician, Roberta Ruggeri, D.O., completed a questionnaire furnished by Mr. Jochem's attorney. Tr. 1442-46. Dr. Ruggeri stated that she had treated Mr. Jochem for nine years. Tr. 1442. She described Mr. Jochem's medical conditions as chronic low back pain with disc fragment at L5-S1; pancreatitis; kidney stones; hyperthyroidism; anxiety; and depression. In her opinion, Mr. Jochem's depression was "profound." *Id.* She did not, however, think Mr. Jochem suffered from an anxiety disorder. Tr. 1444. Dr. Ruggeri rated as "marked" Mr. Jochem's limitations in the areas of concentration, persistence, or pace, and in activities of daily living ("ADLs") because of fatigue. Tr. 1445. In Dr. Ruggeri's opinion, Mr. Jochem was physically capable lifting no more than 10 pounds; standing or walking 20 minutes at a time for up to an hour of an eight-hour day; and sitting 30 minutes at a time for up to two hours of an eight-hour day Tr. 1443. She also thought he would be absent more than two days a month from even a simple, routine and sedentary job because of pain. Tr. 1445.

On January 20, 2009, Dr. Ruggeri noted that Mr. Jochem reported he "cannot go on living as he is living with his current pain regimen which is Lortab 10/500, supposedly 4 a day though he usually takes more than this at one time." Tr. 1364.

Dr. Ruggeri wrote a lengthy chart note on March 10, 2009, commenting that Mr. Jochem had a "chronic pain syndrome" in his thoracic and lumbar spine, with a herniated disk fragment "but no radiculopathy and no weakness in his legs." Tr. 1363. She wrote that Mr. Jochem had chronic lumbar pain "complicated by an overall pain history, which seems to migrate, and he has episodes where he has pain that is out of proportion." *Id.* Dr. Ruggeri added that Mr. Jochem went through "pain periods where he takes too many of his Lortab and then he goes to the

emergency room for extra pain meds," and that he had "failed many antidepressants," including Paxil, Prozac, Zoloft, Effexor, and Welbutrin. *Id.* Dr. Ruggeri recorded a conversation about Mr. Jochem's narcotic contract,[2] "which he needs to stick with," but she agreed to prescribe 30 tablets of Lortab a week. *Id.*

**B.      Hearing Testimony**

Mr. Jochem testified at the hearing that back pain prevented him from continuing to work as a truck driver. Tr. 36. Mr. Jochem said he had a herniated disc and arthritis in both feet, which caused his ankles to "lock up" in cold weather or after standing for extended periods. Tr. 40-42. Mr. Jochem said his problems with depression began when his companion died of cirrhosis of the liver in September 2005. Tr. 43. Before her death, Mr. Jochem said, he had stopped drinking to set an example for her, and he currently drank only "an occasional beer." Tr. 43. After his companion died, he said, he "just kind of lost it," but that he had "given my life to Christ" about a month before the hearing. Tr. 44.

Mr. Jochem testified that on a typical day, he stretches and does exercises for his back. Tr. 45. He cleans his apartment, picks up trash at the apartment complex, and occasionally does landscaping work for his landlord. Tr. 46. He can stand about half an hour at a time and can sit for two hours or more when he has a pillow to support his back. Tr. 46-47. After half an hour of

---

[2] Physicians sometimes require patients to sign an agreement as a condition of receiving narcotic medication for chronic pain. The patient agrees not to accept narcotic prescriptions from another doctor; to use only one pharmacy; not to give prescriptions to anyone else; to keep scheduled appointments; refrain from all mind and mood altering drugs, including alcohol; be responsible for ensuring that he or she does not run out of medications on weekends and holidays to avoid withdrawal symptoms caused by abrupt discontinuation of narcotic medications; and acknowledge that the doctor will not supply additional refills for lost or stolen medications. *See* An Example of a Pain Treatment Agreement, *available at* http:www.webmd.com/pain-management/guide/pain-management-pain-treatment-agreement.

standing, pain "will start in my feet and work its way up," or sometimes his back will start to hurt and "they'll meet each other in the middle." Tr. 47. He does his own car repairs. *Id.* When he is in pain, he takes Lortab, an opiate, and Valium and muscle relaxers to sleep. Tr. 47, 50-51. He no longer takes antidepressants. Tr. 52. The only counseling he receives is from his pastor. Tr. 57. Mr. Jochem testified that for the past two months he has been receiving testosterone and vitamin B-12 shots for fatigue. Tr. 62.

The ALJ called a vocational expert ("VE"), Kay Weiss. Tr. 66. The ALJ asked her to consider an individual capable of light work that involved standing and walking no more than four hours during an eight-hour workday, but did not require climbing, other than stairs and ramps. Additionally, the individual was limited to unskilled work with no public contact. Tr. 68. The VE stated that such an individual could not perform Mr. Jochem's previous work, but could work in small products assembly, DOT 739.687-030l; box assembly inspection, DOT 762.687-014; and hand banding, i.e., assembling small products together for distribution, DOT 920.687-026. Tr. 69.

The ALJ then asked the VE to consider an individual with the limitations identified by Dr. Ruggeri: able to lift 10 pounds occasionally, stand or walk no more than 20 minutes at a time, for a total of one hour, in an eight-hour day, and able to sit 30 minutes at a time for up to two hours of an eight-hour day. Tr. 69. The VE opined that such an individual was not capable of sustained gainful employment. Tr. 70.

## C.    The Sequential Evaluation

The Commissioner has established a five-step sequential process for determining whether a person is disabled. *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1520,

416.920. At step one, the Commissioner determines whether the claimant has engaged in any

substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). If not, the Commissioner

proceeds to step two, to determine whether the claimant has a "medically severe impairment or

combination of impairments." *Yuckert,* 482 U.S. at 140-41; 20 C.F.R. §§ 404.1520(c),

416.920(c). That determination is governed by the "severity regulation," which provides:

> If you do not have any impairment or combination of impairments
> which significantly limits your physical or mental ability to do
> basic work activities, we will find that you do not have a severe
> impairment and are, therefore, not disabled. We will not consider
> your age, education, and work experience.

§§ 404.1520(c), 416.920(c). If the impairment is severe, the evaluation proceeds to the third step,

where the Commissioner determines whether the impairment meets or equals "one of a number

of listed impairments that the [Commissioner] acknowledges are so severe as to preclude

substantial gainful activity." *Yuckert,* 482 U.S. at 140-41. If a claimant's impairment meets or

equals one or more of the listed impairments, the claimant is considered disabled without

consideration of age, education or work experience. 20 C.F.R. §§ 404.1520(d), 416.920(d).

   If the impairment is considered severe, but does not meet or equal a listed impairment,

the Commissioner considers, at step four, whether the claimant can still perform "past relevant

work." 20 C.F.R. §§ 404.1520(e), 416.920(e). If the claimant shows an inability to perform past

work, the burden shifts to the Commissioner to show, in step five, that the claimant has the

residual functional capacity ("RFC") to do other work in consideration of the claimant's age,

education and past work experience. *Yuckert*, 482 U.S. at 141-42; 20 C.F.R. §§ 404.1520(f),

416.920(f).

Under 42 U.S.C. § 423(d)(2)(c), "An individual shall not be considered to be disabled for purposes of this title if alcoholism or drug addiction would . . . be a contributing factor material to the Commissioner's determination that the individual is disabled." When evidence exists of a claimant's drug or alcohol abuse, the claimant bears the burden of proving that his or her substance abuse is not a material contributing factor to his or her disability. *Parra v. Astrue*, 481 F.3d 742, 744-45, 748 (9th Cir. 2007). To carry this burden, the claimant must offer evidence that the disabling effects of the impairment or impairments would remain if the claimant stopped abusing drugs or alcohol. *Id.* at 748-49. Evidence that is inconclusive does not satisfy this burden. *Id.* at 749.

The ALJ must conduct a differentiating analysis to separate the alcohol and drug-related impairments from the unrelated physical impairments if the record indicates that the non-substance-abuse-related impairments are "severe." *Ball v. Massanari,* 254 F.3d 817, 823 (9th Cir. 2001). If the unrelated limitations would not be disabling, the claimant's substance abuse is material and benefits must be denied. 20 C.F.R. § 404.1535(b). *See also Parra,* 481 F.3d at 747. The ALJ must identify disability under the five-step sequential analysis before conducting the drug and alcohol analysis to determine whether substance abuse is material to disability. *Id.*

**D.    The ALJ's Decision**

At step two of the sequential analysis, the ALJ found that Mr. Jochem had the following severe impairments: (1) depression; (2) alcohol abuse and prescription pain medication abuse; and (3) "giving him the benefit of some doubt, the alleged back." [Sic] Tr. 19. The ALJ based the "benefit of the doubt" finding on the normal physical examination by Dr. Henstrom; the chart note from Dr. Blatt suggesting a psychological component to Mr. Jochem's pain; and the MRI of

Opinion and Order, Page 11

the lumbosacral spine in June 2007 showing only mild degeneration and a small paracentral herniation at L5-S1. *Id.* The ALJ rejected Dr. Ruggeri's diagnosis of radiculopathy because the diagnosis was not "supported by the medical evidence of record." Tr. 20.

In support of his finding that Mr. Jochem's alcohol and drug abuse were severe impairments, the ALJ cited: (1) the ER visits of April 22, 2005, March 2006, and May 14, 2006, at all of which Mr. Jochem showed elevated blood alcohol levels; (2) ER physician Dr. Gold's diagnosis of "alcohol abuse with relapse" in March 2006; (3) Mr. Jochem's statement at his May 14, 2006 ER admission that he had used all of the Oxycodone and Vicodin he had been prescribed; (4) Mr. Jochem's report to Dr. Givi of an "extensive drug and alcohol abuse history," including four or five arrests for driving while intoxicated; (5) Dr. Ruggeri's notation in March 2007 that she smelled alcohol on Mr. Jochem's breath; and (6) the April 10, 2007 hospitalization for overdose of alcohol and Xanax, with a blood alcohol level of .285. *Id.* At step three, the ALJ concluded that Mr. Jochem's mental impairments, including the substance abuse, met the criteria of sections 12.04 and 12.09 of the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 416.920(d). The ALJ based this conclusion on Mr. Jochem's well documented medical history of grief over the loss of his companion, numerous suicide attempts by overdose, and conduct indicative of narcotic drug seeking. The ALJ found the evidence reflected that Mr. Jochem, with drug and alcohol abuse, had "moderate" limitations in ADLs and "marked" limitations in the areas of maintaining social functioning and maintaining concentration, persistence or pace. Tr. 22.

The ALJ found Mr. Jochem not entirely credible about his pain, depression, and other symptoms. The ALJ cited Mr. Jochem's inconsistent answers to questions about his drinking,

including the statement, "I never get drunk," the testimony that he drinks two to three beers a day, and the testimony that Dr. Ruggeri "yells at me and tells me to get this under control." Tr. 23. The ALJ noted that Mr. Jochem had "vaguely testified that he cannot work because of his 'feet and back,' " but that Mr. Jochem had also acknowledged he worked part-time in 2006 until the company that employed him was sold. Tr. 23. The ALJ found that objective medical evidence did not support Mr. Jochem's claim of radiculopathy, arthritis in his feet, or the claim that his ankles "lock up." *Id.* The ALJ found further that Mr. Jochem was "vague and somewhat evasive about his prescription drug seeking behavior and alcohol abuse," including his apparent lack of knowledge about his treatment and medications, which appeared to be "more from lack of treatment than he alleges." Tr. 23. With respect to the depression, the ALJ found that Mr. Jochem had not followed up on referrals for drug and alcohol abuse treatment and had not been compliant with an antidepressant regimen. Tr. 23-24.

The ALJ gave no weight to Dr. Givi's opinion that Mr. Jochem's "levels of psychopathology and physical problems are severe enough to keep him from seeking employment." The ALJ noted that Dr. Givi seemed to have relied on Mr. Jochem's subjective pain complaints, and that Dr. Givi's evaluation omitted any reference to Mr. Jochem's drug and alcohol abuse and acknowledged that "assessment of the claimant's physical complaints is outside the scope of the evaluation." Tr. 22.

The ALJ gave little weight to Dr. Ruggeri's responses to the September 16, 2009 questionnaire. The ALJ noted that she had rated Mr. Jochem's depression as "profound," but "ignores her own numerous reports where he unilaterally ceased taking his antidepressant medication for months at a time in 2004 and 2007," and the absence of any chart reference to

Mr. Jochem's taking antidepressants after July 2007. Tr. 22, 24. The ALJ did not credit

Dr. Ruggeri's statement that Mr. Jochem's profound depression resulted from chronic pain

because the signs, clinical findings, and imaging in the evidence did not support Mr. Jochem's

chronic pain complaints; further, Mr. Jochem was, during the time he was treated by

Dr. Ruggeri, working three hours a day, which "further erodes her blanket applications of

'marked' limitations across the board."  Tr. 24. The ALJ also noted that Dr. Ruggeri failed to

mention in the questionnaire Mr. Jochem's continued alcohol consumption, or her own concerns

about Mr. Jochem's prescription drug seeking behavior in his multiple emergency room visits for

extra pain medications. *Id.*, citing tr. 1363. The ALJ observed that Dr. Ruggeri was not a mental

health treatment provider and that she had repeatedly advised Mr. Jochem to obtain mental

health counseling. *Id.*

On the basis of this evidence, the ALJ concluded that absent the substance abuse, Mr.

Jochem would not have an impairment or combination of impairments that met or medically

equaled any of the impairments in the Listing of Impairments. *Id.* Although the ALJ found Mr.

Jochem's depression severe, he concluded that without drug and alcohol abuse, Mr. Jochem's

depression was intermittent, and that the functional limitations as a consequence of his

depression were mild to moderate, without episodes of decompensation, insufficient to satisfy

criteria "B" and "C" for listing 12.04 (Affective-Depressive Disorders). The ALJ concluded that

Mr. Jochem's medically determinable severe and non-severe impairments, without drug and

alcohol abuse, did not meet or medically equal the criteria for any listed impairments. Tr. 25.

The ALJ found that Mr. Jochem's medically determinable impairments could reasonably

be expected to produce the symptoms Mr. Jochem described, but that Mr. Jochem's statements

about the intensity, persistence, and limiting effects of his symptoms were not credible. The ALJ

adopted the RFC assessments of the reviewing medical consultants done in April 2007,

concluding that without drug and alcohol abuse, Mr. Jochem could not perform his past work,

but that he could perform light work with the limitations identified in the hypothetical to the VE,

including the three jobs identified by the VE in her testimony: small products assembler, box

assembly inspector, and hand packager. Tr. 26-27.  Accordingly, the ALJ concluded that if Mr.

Jochem's substance abuse ceased, he would not be disabled. Tr. 27.

### III.  STANDARD OF REVIEW

The Court must affirm the Commissioner's decision if it is based on proper legal

standards and the findings are supported by substantial evidence in the record.  *Meanel v. Apfel*,

172 F.3d 1111, 1113 (9th Cir. 1999). In determining whether the Commissioner's findings are

supported by substantial evidence, the Court must review the administrative record as a whole,

weighing both the evidence that supports and the evidence that detracts from the Commissioner's

conclusion.  *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998). The Commissioner's decision

must be upheld even if  "the evidence is susceptible to more than one rational interpretation."

*Andrews v. Shalala*, 53 F.3d 1035, 1039-40 (9th Cir. 1995).

The initial burden of proving disability rests on the claimant.  *Meanel*, 172 F.3d at 1113.

To meet this burden, the claimant must demonstrate an "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which

. . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]"

42 U.S.C. § 423(d)(1)(A).  A physical or mental impairment is "an impairment that results from

anatomical, physiological, or psychological abnormalities which are demonstrable by medically

acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). This means an impairment must be medically determinable before it is considered disabling.

## IV.  DISCUSSION

Mr. Jochem asserts that the ALJ erred in rejecting the opinions of Dr. Ruggeri and Dr. Givi and in failing to discuss the third party statement of Mr. Jochem's friend, Paula Parker.

### 1.    Rejection of Dr. Ruggeri's Opinions

In disability benefits cases, physicians typically provide one or both of two types of opinions: medical opinions that speak to the nature and extent of a claimant's limitations, and opinions concerning the ultimate issue of disability, i.e., opinions about whether a claimant is capable of any work, given her or his limitations. *Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001). Medical opinions are weighted differently from an evidentiary standpoint depending on source.

There are three sources of medical opinions: treating, examining, and non-treating, non-examining ("reviewing") physicians who only review the claimant's file.  *Id.*; *Lester v. Chater,* 81 F.3d 821, 830 (9th Cir. 1995); 20 C.F.R. § 404.1527(d). Generally, a treating physician's opinion carries more weight than an examining physician's, and an examining physician's opinion carries more weight than a reviewing physician's. *Holohan,* 246 F.3d at 1202;  20 C.F.R. § 404.1527(d). In addition, the regulations give more weight to opinions that are explained than to those that are not, 20 C.F.R. § 404.1527(d)(3), and to the opinions of specialists concerning matters relating to their specialty over that of nonspecialists.  *Holohan,* 246 F.3d at 1202; 20 C.F.R. § 404.1527(d)(5).

The ALJ may rely on the medical opinion of a non-treating doctor instead of the contrary opinion of a treating doctor only if the ALJ provides "specific and legitimate" reasons supported by substantial evidence in the record. *Id.* The treating physician's opinion is still entitled to deference and must be weighted using all the factors provided in 20 C.F.R. § 404.1527. *Id.; Orn v. Astrue,* 495 F.3d 625, 631 (9th Cir. 2007) (If a treating physician's opinion is not given controlling weight because it is not "well supported" or because it is inconsistent with other substantial evidence in the record, the ALJ is to consider specified factors in determining the weight it will be given, including the length of the treatment relationship and the frequency of examination by the treating physician and the nature and extent of the treatment relationship between the patient and the treating physician.)

Disability opinions are reserved for the Commissioner. 20 C.F.R. §§ 404.1527(e)(1); 416.927(e)(1). Physicians may, however, provide opinions on the ultimate issue of disability, i.e., about whether a claimant is capable of any work, given the claimant's limitations. *Holohan,* 246 F.3d at 1202. The ALJ is not bound by the uncontroverted opinions of physicians on disability, but cannot reject them without presenting clear and convincing reasons for doing so. *Reddick*, 157 F.3d at 725. A treating physician's opinion on disability, even if controverted, can be rejected only with specific and legitimate reasons supported by substantial evidence in the record. *Id.* Specific and legitimate reasons for rejecting an opinion include its reliance on a claimant's discredited subjective complaints or its inconsistency with medical records or a claimant's daily activities. *Tommasetti v. Astrue*, 533 F.3d 1035, 1040 (9th Cir. 2008).

The court concludes that the ALJ's reasons for rejecting Dr. Ruggeri's September 16, 2009 opinions satisfy the "specific and legitimate" standard and are based on substantial

evidence in the record. Dr. Ruggeri's opinions are expressed in brief responses or check marks in boxes in response to the questionnaire. Tr. 1442-46.  The ALJ was correct to reject them for that reason. *See, e.g., Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005) *(*ALJ not required to accept a physician's opinion that is brief, conclusory, or inadequately supported by clinical findings); *Crane v. Shalala*, 76 F.3d 251, 253 (9th Cir. 1996) (ALJ properly rejected check-off reports that did not contain any explanation of bases for conclusions).

Dr. Ruggeri's opinion that Mr. Jochem's depression was "profound" is inconsistent with Dr. Givi's findings in March 2007 that Mr. Jochem showed no evidence of a thought disorder, denied current homicidal and suicidal ideation, and reported not having had suicidal ideation for the past 10 months. Tr. 471. Dr. Givi's opinions are entitled to more weight than those of Dr. Ruggeri because they were rendered by a specialist in his area of specialty; Dr. Ruggeri is not a mental health specialist. *See* 20 C.F.R. § 404.1527(d)(5) and *Holohan,* 246 F.3d at 1202 (more weight given to opinions of specialists concerning matters relating to their specialty over that of nonspecialists). In addition, as the ALJ noted, Dr. Ruggeri's diagnosis of profound depression is undermined by her chart notes' numerous references to Mr. Jochem's unilateral decisions to stop taking prescribed antidepressants because of vague "side effects." *See, e.g.,* tr. 1363 ("failed many antidepressants including Paxil, Prozac, Zoloft, Effexor, Wellbutrin"); tr. 1392 ("tried Zoloft and slept 35 hours"); tr. 1402 ("stopped antidepressant [because] felt 'dull in the head' "); tr. 1406 (Paxil caused "poor thoughts" and made him slightly suicidal"); tr. 1407 ("antidepressants make him feel worse").

The ALJ was also correct in discounting Dr. Ruggeri's September 2009 assessment of Mr. Jochem because it omitted any discussion of his abuse of narcotic pain medications,

although this is well documented in Dr. Ruggeri's records for the years 2008 and 2009. *See, e.g.,*
tr. 1397 (declining Mr. Jochem's request on April 4, 2008 for more oxycontin); tr. 1385
(September 12, 2008 request for more oxycontin since doctor's office out of Lidoderm patches);
tr. 1384 (September 1, 2008 request for refill of oxycontin prescription); tr. 1384 (October 7,
2008 request for more oxycontin); tr. 1383 (request for medication on October 22, 2008 because
"back really hurts and has taken his pills for day;" denied because "[j]ust filled pain meds
10/20/08. No more refills. Cannot change contract"); tr. 1381 (November 14, 2008 request for
more Lortab for weekend, "as he is out"); tr. 1378 (January 9, 2009 request for more
oxycodone); tr. 1376 (February 4, 2009 denial of request for more oxycodone, with notation,
"must adhere to a contract–whether it be oxycodone or Lortab and cannot exceed dosage");
tr. 1364 (January 20, 2009 notation "difficulty maintaining a med contract on Lortab"); tr. 1363
(March 10, 2009 reference to narcotic contract, "which he needs to stick with"); tr. 1370 (June 3,
2009 note declining patient request for more Oxycontin).

   The ALJ correctly discounted Dr. Ruggeri's diagnosis of radiculopathy on the ground
that it was unsupported by the medical evidence. The diagnosis is, in fact, directly contradicted
by her own chart note of March 10, 2009 ("no radiculopathy," tr. 1363) as well as by the
examination findings of Doctors Henstrom and Blatt, and by x-rays and MRIs showing only
mild degenerative changes.

   Dr. Ruggeri's opinion that Mr. Jochem could lift no more than 10 pounds, stand or walk
no more than 20 minutes at a time for up to an hour, and sit 30 minutes at a time for up to two
hours is contradicted by the opinion of examining physician Dr. Henstrom that Mr. Jochem
could stand and walk for four to six hours out of an eight hour day, sit for eight hours, and lift up

to 25 pounds occasionally and 10 pounds frequently. Dr. Lahr's opinion was that Mr. Jochem could lift 50 pounds occasionally and 25 pounds frequently, and stand or walk about six hours in an eight-hour work day.

Dr. Ruggeri's opinion that Mr. Jochem had marked limitations in the areas of concentration, persistence, or pace, and in ADLs is contradicted by the opinion of mental health specialist Dr. Givi's conclusion that Mr. Jochem was independent in his ADLs and adequately managed his own medications, tr. 471, as well as by Mr. Jochem's performance on memory testing. The ALJ correctly rejected Dr. Ruggeri's "blanket" assessment of marked limitations on this basis.

### 2.    Rejection of Dr. Givi's Opinion

Mr. Jochem challenges the ALJ's rejection of Dr. Givi's opinion that Mr. Jochem's psychopathology and physical problems were severe enough to "keep him from seeking employment." The ALJ rejected this opinion because: (1) Dr. Givi's opinion relied on Mr. Jochem's allegations of pain, which the ALJ found not credible; (2) Dr. Givi omitted any reference to Mr. Jochem's drug and alcohol abuse; and (3) Dr. Givi acknowledged that assessment of Mr. Jochem's physical complaints was outside the scope of his evaluation. These reasons are specific and legitimate and based on substantial evidence in the record. *See, e.g., Tommassetti*, 533 F.3d at 1040 (specific and legitimate reasons include reliance on a claimant's discredited subjective complaints and inadequate support by clinical medical findings). I find no error here.

### 3.    Failure to Consider Statement of Paula Parker

Lay testimony as to a claimant's symptoms is competent evidence which the

Opinion and Order, Page 20

Commissioner must take into account, *Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir. 1993),

unless he or she expressly decides to disregard such testimony, in which case "he must give

reasons that are germane to each witness." *Id. See also Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir.

2001) and *Stout v. Comm'r*, 454 F.3d 1050, 1053 (9th Cir. 2006). While lay witnesses are not

competent to testify to medical diagnoses, they may testify as to a claimant's symptoms or how

an impairment affects ability to work, *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996),

and therefore their testimony cannot be disregarded without comment. *Id. See also* 20 C.F.R.

§ 404.1513(d)(4) (evidence provided by lay witnesses may be used to show severity of

claimant's impairments and how it affects claimant's ability to work).

      Paula Parker submitted a report dated February 19, 2007, stating that she saw Mr.

Jochem for approximately an hour every week and called him daily for 15-30 minutes. Tr. 176.

Ms. Parker stated that over the previous two and a half years, she had "seen his physical and

mental health become very poor. The depression he suffers from is serious and his physical

ailments have gotten worse." Tr. 183. Ms. Parker wrote that Mr. Jochem did "very light

housework because vacuuming, mopping hurts," did laundry occasionally, and did not do

outdoor chores "that I know of." Tr. 178. She also wrote that Mr. Jochem shopped for groceries

"once or twice a week." Tr. 179. In response to a section asking about Mr. Jochem's ability to

lift, stand, reach, walk, kneel and climb stairs, she wrote, "[O]nly seems to be able to do a

minimum of above checked items–he might try to do an activity such as vacuuming but has to

stop if arms or legs or back start to hurt." Tr. 181. She did not think Mr. Jochem had problems

with paying attention, finishing things he started, or following spoken instructions. *Id.*

The ALJ made no reference to Ms. Parker's report in his decision. The ALJ's failure to comment on competent lay testimony requires reversal unless the court can "confidently conclude" that no reasonable ALJ, when fully crediting the testimony, could have reached a different disability determination. *Stout v. Comm'r*, 454 F.3d 1050, 1056 (9th Cir. 2006). I conclude that under this standard, the ALJ's failure to comment on Ms. Parker's statement does not require reversal. Fully crediting Ms. Parker's statements has no effect on either the ALJ's materiality analysis or his determination that in the absence of alcohol and substance abuse, Mr. Jochem is not disabled. Ms. Parker makes no reference to Mr. Jochem's substance abuse problems. Her description of Mr. Parker's ADLs is consistent with other evidence in the record, and does not suggest that Mr. Jochem has marked limitations in this area. Ms. Parker characterizes Mr. Jochem's depression as "serious," which is consistent with other medical evidence accepted by the ALJ. Accordingly, I conclude that the ALJ's failure to discuss Ms. Parker's statement was harmless error.

## V.  CONCLUSION

The Commissioner's decision is AFFIRMED.

IT IS SO ORDERED.

DATED this 12th day of January, 2012.


/s/ Michael H. Simon
    Michael H. Simon
    United States District Judge


Opinion and Order, Page 22